583 So.2d 647 (1991)
Alphonso GREEN, Appellant,
v.
STATE of Florida, Appellee.
No. 71540.
Supreme Court of Florida.
June 6, 1991.
Rehearing Denied August 23, 1991.
*648 Robert Fraser of Sawyer and Pilka, P.A., Tampa, for appellant.
Robert A. Butterworth, Atty. Gen., and Donna A. Provonsha, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Alphonso Green appeals his convictions for two counts of first-degree murder and the sentences of death imposed for both counts by the trial court in accordance with the jury's recommendation. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed, we affirm the convictions and the death sentences.
The relevant facts are as follows. Alphonso Green lived in a rented duplex apartment with his girlfriend, Cassandra Jones, in Hillsborough County. They rented this apartment from Robert and Dora Nichols. On October 1, 1986, the sheriff posted an eviction notice on Green's apartment. There was a subsequent agreement between Green and the Nicholses that the $250 in back rent would be due on October 10, 1986, or the couple would have to vacate. On the evening of October 10, 1986, Green and Ms. Jones went to the Nicholses' home and paid the $250.
Douglas Atkins lived in an apartment adjacent to the Nicholses' home. On the night of October 10, he heard a knock on his window, followed by a loud knocking on the Nicholses' door. Atkins observed a black man, wearing no shoes or shirt. Neither he nor his girlfriend could identify the individual. Atkins went to the nearby *649 home of another neighbor and armed himself. Upon returning, he heard drawers opening and closing in the Nicholses' home. Atkins left again to get the neighbor and, accompanied by the neighbor, went to the Nicholses' home. This time, the home was quiet and the lights were off. They entered and saw Mrs. Nichols lying dead on the floor.
The investigating officer, Detective Noblitt, arrived at the Nicholses' home after midnight on October 11, 1986. His testimony reflects that he discovered Mrs. Nichols lying inside the house near the front foyer; that she had been stabbed fourteen times; that Mr. Nichols was lying in the bedroom with bed covers stuffed into his mouth; that he had twenty-eight stab wounds; that he observed blood smears throughout the house and outside on the entrance railing, doors, handles, and gate; and that he found a green work shirt lying on the bedroom floor, which Green later identified as his own. The detective testified that he had been advised that a knife was missing from Green's kitchen. He went to Green's and Jones' residence and obtained from Jones a signed consent form to search the premises. As a result of this search, the police discovered several knives, including a butcher knife with a broken handle.
The testimony established that Green traveled to St. Petersburg and then to Ft. Lauderdale where he surrendered to the police. On October 20, Detective Noblitt and Sergeant Price arrived at the Ft. Lauderdale Police Department with a warrant for Green's arrest. The officers read Green his Miranda[1] rights, and Green signed a consent form. The officers testified that Green described the events of October 10, 1986. According to Detective Noblitt, Green stated that, after paying the Nicholses the $250, Green had a series of encounters with acquaintances during which he smoked cocaine; that afterwards he and a man named Bobby decided to retrieve the $250 check from the Nicholses' home to buy additional cocaine; that Green and Bobby walked to the alley behind Green's apartment; that Green pushed in his back door and Ms. Jones, who was inside, yelled at him; that they next went to the Nicholses' residence; that Green and Bobby knocked on the Nicholses' door and Mr. Nichols allowed them inside; that Green asked for his check and Mrs. Nichols refused; that Bobby then pulled out a large butcher knife and started stabbing Mrs. Nichols; that Mr. Nichols ran to the bedroom; and that Green and Bobby then left the home.
Detective Noblitt testified that he challenged Green's account and explained to Green that his investigation indicated that only one person had committed the crimes. Noblitt stated that Green again said that Bobby did it. Finally, Green admitted that there was no Bobby, that he was by himself, and that he could not believe what he had done. In his final confession, Noblitt stated that Green admitted that he came home, put on a clean work shirt, and took the largest butcher knife from the house; that he went to the Nicholses' home and was admitted by Mr. Nichols; that Mrs. Nichols was adamant about keeping Green's check; that the next thing he knew was that Mrs. Nichols was on the floor, stabbed and bleeding; that he followed Mr. Nichols to the back bedroom; that the next thing he knew was that Mr. Nichols was on the floor stabbed, bleeding and moaning; that he stuffed the blanket into Mr. Nichols' mouth; that he wiped the blood from his hands onto his shirt, which he stuck into his back pocket; that, as he started to leave, he saw a white neighbor, who also rented from the Nicholses; that he jumped over several fences and returned to his apartment, changed clothes, and walked to the Boston Bar; and that, later that night, he hitched a ride to St. Petersburg and then to Ft. Lauderdale, where he stayed one night before turning himself in to the police department. As part of this statement, Green explained that a scar on the palm of his right hand was the result of a rivet on the butcher knife which cut him when he grabbed the knife and thrust it. He also stated that he had put the knife back in his apartment.
*650 At trial, Green testified on his own behalf and denied having committed the murders or having confessed to the detectives. He claimed instead that Bobby either punched or stabbed Mr. Nichols when he opened the door and that he was intoxicated by cocaine. He maintained that the detectives fabricated his confession.
During the jury-selection process, the state challenged three black jurors peremptorily over defense objections. In response to the second objection, the trial judge concluded that there was a sufficient showing for Neil[2] purposes and required the state to give reasons for its peremptory challenges.
The record reflects that juror No. 14, the first black juror challenged peremptorily by the state, stated during voir dire that he knew Green and his mother and other witnesses and that he would be very uncomfortable in serving. The trial court found that this was a justifiable reason and Green concedes that this was a proper peremptory challenge.
Juror No. 18, the second black juror challenged peremptorily, expressed concern during voir dire about the death penalty and did not believe that it had a deterrent effect. The colloquy that formed the reason for the state's peremptory challenge was as follows:
Q What kind of views do you have on the death penalty?
A I can see both sides of it... . But it certainly hasn't deterred people from committing terrible crimes... .
... .
There is no deterrent by it... .
Q What are your personal views; you can't decide?
A I just don't know... .
... .
Q Do you think you could under the appropriate circumstances recommend to Judge Menendez that a person be given the death penalty?
A It would have to be something terrible. Somebody would have had to have done something very bad.
Q Well, what if the ... factors don't read like that, and I don't mean to tease you, but they don't read "terrible," you know, "real bad." They read "cruel or" 
A The person would have had to have known what he was doing. If he was insane or something or if he was crazy, I couldn't do it then.
Q But could you apply those factors that the Judge gave you in reaching your decision?
A Yeah.
Q Would you agree to do that?
A Yes.
Q Do you understand that if you are selected and take the oath, that you have to do that?
A I wouldn't have any choice, sure.
The trial judge found that, although juror No. 18's comments about the death penalty did not amount to grounds to excuse her for cause, her statements did constitute a valid reason for a peremptory challenge by the state.
The third black juror challenged peremptorily, juror No. 23, stated that she knew two witnesses listed by the defense. The trial judge concluded in this instance that the reason given by the state was not appropriate for a challenge for cause, but found that the juror's acquaintance with the defense witness was an appropriate reason for permitting a peremptory challenge.
At the conclusion of the trial, the jury found Green guilty of both counts of first-degree murder. The only additional evidence presented, at the penalty phase, consisted of testimony from a prosecutor who had prosecuted Green in 1974 for attempted rape, a charge to which Green pleaded nolo contendere and for which he was adjudicated guilty by the court. After deliberations, the jury unanimously recommended the imposition of the death penalty.
The trial judge followed the jury's recommendation and, in imposing the death sentence, found the following aggravating circumstances: (1) that the defendant had *651 previously been convicted of another capital felony involving the use or threat of violence to a person;[3] (2) that the capital felony was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit, a robbery or burglary;[4] (3) that the capital felony was committed for the purpose of avoiding or preventing a lawful arrest;[5] (4) that the capital felony was committed for pecuniary gain;[6] (5) that the capital felony was especially heinous, atrocious, or cruel;[7] and (6) that the capital felony was a homicide committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.[8] After finding no mitigating circumstances, the trial judge concluded:
There is neither any aspect of the defendant's character, or record, nor any other circumstance of the offenses which could be considered a mitigating circumstance that would outweigh the aggravating circumstance[s] herein.
... .
The Court, being fully aware and advised of the facts and circumstances surrounding the defendant and the offenses for which he now stands convicted finds that the aggravating circumstances outweigh the mitigating circumstances and accordingly, concludes that the jury's advisory sentence of death should be imposed.

Guilt Phase
Green claims that during the guilt phase of his trial, the trial court erred by: (1) failing to declare a mistrial after the state excluded three blacks as jurors by the exercise of peremptory challenges; (2) allowing certain alleged hearsay statements introduced by the state, depriving Green of a fair trial; and (3) allowing the state to commit fundamental error by insinuating that the defendant once intended to rely on the intoxication defense.
The first claim merits a full discussion. Green contends that the trial court erroneously permitted the state to peremptorily challenge two black female jurors. Green argues that these two jurors were excused while two other white jurors were kept when they gave similar responses to the voir dire inquiries.
In State v. Slappy, 522 So.2d 18, 22 (Fla.), cert. denied, 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988), we held that, once the Neil test is met, the burden is on the state to rebut the inference of discrimination by a clear and reasonably specific racially neutral explanation of legitimate reasons for the state's exercise of its peremptory challenges. These racially neutral reasons need not rise to the level justifying a challenge for cause. Id. The trial judge has the responsibility to evaluate both the credibility of the person giving the explanation and the credibility of the reasons asserted.
We find the comments of juror No. 18 concerning the death penalty and, in her view, its lack of deterrence, formed a sufficient basis in the record for the trial judge to conclude that the state's reason for the exercise of the peremptory challenge was racially neutral and not a pretext. In doing so, we find the argument that other jurors gave the same responses and remained on the jury has no merit. None of the other prospective jurors spoke about the death penalty's deterrent effect. With regard to juror No. 23, we find that the reasons given by the state were also racially neutral and not a pretext with regard to her knowledge of the witnesses. It is clear from this record that she knew a witness who was to be used by the defense in the penalty phase as a character witness. We note that other jurors who had expressed knowledge of some of the witnesses and who remained on the jury principally *652 knew witnesses who were to be called for the state. The identity of a witness and the subject of the witness's testimony, as well as which party is calling the witness, are all factors that have a bearing on the exercise of a peremptory challenge. Because the trial judge sees and hears the prospective jurors, he or she has the ability to assess the candor and the credibility of the answers given to the questions presented. Clearly, the trial judge is in the best position to determine if peremptory challenges have been properly exercised. State v. Williams, 465 So.2d 1229 (Fla. 1985). After reviewing the record, we cannot say that the trial judge abused his discretion in finding that the exercise of these peremptory challenges was racially neutral and not a pretext.
With regard to the remaining claims in the guilt phase, we find no reversible error under the circumstances of this case and conclude that no further discussion is necessary.
Accordingly, the convictions should be affirmed.

Penalty Phase
Green raises the following errors in the penalty phase of his trial: (1) that the trial court's finding that the murders were committed for the purpose of avoiding or preventing a lawful arrest is not supported by the record; (2) that the trial court unlawfully doubled the aggravating circumstances that the murders were committed in the commission of a robbery or burglary with their being committed for pecuniary gain;[9] (3) that the trial court's finding that the murders were committed in a cold, calculated, and premeditated manner is not justified under the law;[10] (4) that the instruction that the murders were especially heinous, atrocious, or cruel was unconstitutionally vague; (5) that whether Green had a significant history of prior criminal activity presented a jury question that the trial court improperly failed to submit for consideration; (6) that the prosecutor's comments during the penalty phase argument deprived Green of a fair sentencing hearing; and (7) that the misleading comments of the trial judge and the prosecutor with regard to the function of the jury denigrated it in light of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).
With regard to the first claim, we agree with Green that the use of the aggravating circumstance of avoiding a lawful arrest is not supported by this record. As we stated in Caruthers v. State, 465 So.2d 496 (Fla. 1985), the state must show that the elimination of witnesses was at least a dominant motive. We find that the state clearly failed to make such a showing. Consequently, that aggravating circumstance must be eliminated from consideration.
As to the second claim, we also agree that the trial court improperly doubled the aggravating circumstance that the murders were committed in the commission of a robbery or burglary with their being committed for pecuniary gain. Because both aggravating factors arose out of the same episode, these aggravating circumstances must be considered as a single aggravating factor. Mills v. State, 476 So.2d 172 (Fla. 1985), cert. denied, 475 U.S. 1031, 106 S.Ct. 1241, 89 L.Ed.2d 349 (1986). Accordingly, these two aggravating factors should be considered as one.
Regarding Green's third claim, we agree that the trial court erred in applying the aggravating circumstance that the murders were committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification, as that aggravating circumstance has been defined. This aggravating circumstance is principally reserved for murders characterized as execution or contract murders or those involving the elimination of witnesses. Bates v. State, 465 So.2d 490, 493 (Fla. 1985). Proof of this aggravating circumstance *653 requires evidence of calculation prior to the murder. See Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). There is insufficient evidence in the record to justify this aggravating factor.
We reject Green's remaining claims and conclude that they do not merit further discussion.
We hold that the aggravating factors of cold, calculated, and premeditated and witness elimination are unsupported in this record. We also hold that the aggravating factors of a crime committed during the commission of a robbery or burglary and for pecuniary gain must be consolidated as one. As a result of these conclusions, three valid aggravating factors remain: (1) Green was previously convicted of another capital felony or a felony involving the use or threat of violence to another person; (2) the crime was committed for pecuniary gain and/or during the commission of a robbery or burglary; and (3) the capital felony was especially heinous, atrocious, or cruel. Because there are three valid aggravating factors and no mitigating factors, we conclude that the death sentence should be affirmed. We do so because we find that there is no reasonable likelihood that the trial court would have concluded differently, given the circumstances of this case. See Wright v. State, 473 So.2d 1277 (Fla. 1985), cert. denied, 474 U.S. 1094, 106 S.Ct. 870, 88 L.Ed.2d 909 (1986).[11]
For the reasons expressed, we affirm Green's convictions and sentences of death.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD and GRIMES, JJ., concur.
BARKETT, J., dissents with an opinion, in which KOGAN, J., concurs.
BARKETT, Justice, dissenting.
I believe reversal is warranted under State v. Neil, 457 So.2d 481 (Fla. 1984), clarified, State v. Castillo, 486 So.2d 565 (Fla. 1986); State v. Slappy, 522 So.2d 18 (Fla.), cert. denied, 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988); and Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The majority concludes that the state met its burden of providing race-neutral reasons for peremptorily challenging prospective juror 18. However, the record belies such a conclusion when that challenge is properly viewed in the context of the jury-selection process in this case.
The pretextual nature of the state's challenge of prospective juror 18 is apparent from the responses of prospective juror 12, a Caucasian juror whom the state declined to challenge. Number 12 stated that she was not opposed to the death penalty. The prosecutor then asked:
Q You could recommend under the right circumstances that the death penalty be imposed?
A If in my mind I was absolutely sure.
Q Okay. Let's talk about that. If in your mind 
A If it was proven to me beyond a shadow of a doubt  if I had the slightest question in my mind, then I wouldn't.
... .
Q Now, what I need to get from you is a simple commitment that you will follow [the aggravating and mitigating circumstances] and not lessen our burden because you're angry or not, heighten our burden or increase it because of your personal reservations about the death penalty?
A Yes, I can do that? [sic]
Q You can do that?
A Yes.
*654 During initial questioning, prospective jurors 18[12] and 12 expressed somewhat qualitatively different views on the death penalty, although the view expressed by prospective juror 12 (that death was appropriate only if proved "beyond a shadow of a doubt") was even more demanding of the state than the view expressed by prospective juror 18 (who "just [did not] know" what her personal views were, but death would be appropriate if someone had done "something terrible ... something very bad"). The majority relies on the fact that juror 18 "spoke about the death penalty's deterrent effect," slip op. at 10, to distinguish that person in a race-neutral way from other prospective jurors. However, her brief reference to deterrence does not distinguish her from other prospective jurors in light of the fact that she said she did not know what her personal view was concerning the propriety of the death penalty. Moreover, later questioning indicates that each of these prospective jurors agreed to follow the law. Clearly, the challenge to prospective juror 18 under these circumstances was based upon a reason equally applicable to prospective juror 12, who was not challenged, and thus refutes the state's claim that the reason for challenging juror 18 was race-neutral. See Slappy, 522 So.2d at 22.
Accordingly, I dissent.
KOGAN, J., concurs.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] State v. Neil, 457 So.2d 481 (Fla. 1984), clarified, State v. Castillo, 486 So.2d 565 (Fla. 1986).
[3] § 921.141(5)(b), Fla. Stat. (1987).
[4] Id. § 921.141(5)(d).
[5] Id. § 921.141(5)(e).
[6] Id. § 921.141(5)(f).
[7] Id. § 921.141(5)(h).
[8] Id. § 921.141(5)(i).
[9] We note that the state, in presenting its argument to the jury, did not argue that the commission of a robbery was a separate aggravating circumstance.
[10] We note that the state, in presenting its argument to the jury, did not argue cold, calculated, and premeditated as an aggravating circumstance.
[11] Other cases in which this Court has upheld the death penalty despite consideration of an invalid aggravating factor include: Holton v. State, 573 So.2d 284 (Fla. 1990); Hill v. State, 515 So.2d 176 (Fla. 1987), cert. denied, 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988); Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988); Bassett v. State, 449 So.2d 803 (Fla. 1984); and Brown v. State, 381 So.2d 690 (Fla. 1980), cert. denied, 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981).
[12] The colloquy with prospective juror 18 appears in the majority opinion.