907 So.2d 489 (2005)
Alphonso GREEN, Appellant,
v.
STATE of Florida, Appellee.
No. SC02-2315.
Supreme Court of Florida.
April 28, 2005.
Rehearing Denied July 7, 2005.
*491 James Marion Moorman, Public Defender and Robert F. Moeller, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Robert J. Landry, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
Alphonso Green appeals his sentences of death for two counts of first-degree murder imposed after resentencing. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated herein, we affirm the circuit court's judgment sentencing Green to death.

FACTS AND PROCEDURAL HISTORY
Alphonso Green was convicted of the first-degree murder of Robert Nichols and the first-degree murder of Dora Nichols. See Green v. State, 583 So.2d 647, 648 (Fla.1991). The jury unanimously recommended *492 the death penalty. See id. at 650. Following that recommendation, the trial court imposed death sentences for the first-degree murder convictions. See id. On direct appeal, this Court affirmed Green's convictions and death sentences. See id. at 648. There, this Court detailed the facts surrounding the murders of Robert and Dora Nichols:
Alphonso Green lived in a rented duplex apartment with his girlfriend, Cassandra Jones, in Hillsborough County. They rented this apartment from Robert and Dora Nichols. On October 1, 1986, the sheriff posted an eviction notice on Green's apartment. There was a subsequent agreement between Green and the Nicholses that the $250 in back rent would be due on October 10, 1986, or the couple would have to vacate. On the evening of October 10, 1986, Green and Ms. Jones went to the Nicholses' home and paid the $250.
Douglas Atkins lived in an apartment adjacent to the Nicholses' home. On the night of October 10, he heard a knock on his window, followed by a loud knocking on the Nicholses' door. Atkins observed a black man, wearing no shoes or shirt. Neither he nor his girlfriend could identify the individual. Atkins went to the nearby home of another neighbor and armed himself. Upon returning, he heard drawers opening and closing in the Nicholses' home. Atkins left again to get the neighbor and, accompanied by the neighbor, went to the Nicholses' home. This time, the home was quiet and the lights were off. They entered and saw Mrs. Nichols lying dead on the floor.
The investigating officer, Detective Noblitt, arrived at the Nicholses' home after midnight on October 11, 1986. His testimony reflects that he discovered Mrs. Nichols lying inside the house near the front foyer; that she had been stabbed fourteen times; that Mr. Nichols was lying in the bedroom with bed covers stuffed into his mouth; that he had twenty-eight stab wounds; that he [Detective Noblitt] observed blood smears throughout the house and outside on the entrance railing, doors, handles, and gate; and that he found a green work shirt lying on the bedroom floor, which Green later identified as his own. The detective testified that he had been advised that a knife was missing from Green's kitchen. He went to Green's and Jones' residence and obtained from Jones a signed consent form to search the premises. As a result of this search, the police discovered several knives, including a butcher knife with a broken handle.
The testimony established that Green traveled to St. Petersburg and then to Ft. Lauderdale where he surrendered to the police. On October 20, Detective Noblitt and Sergeant Price arrived at the Ft. Lauderdale Police Department with a warrant for Green's arrest. The officers read Green his Miranda [v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] rights, and Green signed a consent form. The officers testified that Green described the events of October 10, 1986. According to Detective Noblitt, Green stated that, after paying the Nicholses the $250, Green had a series of encounters with acquaintances during which he smoked cocaine; that afterwards he and a man named Bobby decided to retrieve the $250 check from the Nicholses' home to buy additional cocaine; that Green and Bobby walked to the alley behind Green's apartment; that Green pushed in his back door and Ms. Jones, who was inside, yelled at him; that they next went to the Nicholses' residence; that Green and Bobby knocked on the Nicholses' *493 door and Mr. Nichols allowed them inside; that Green asked for his check and Mrs. Nichols refused; that Bobby then pulled out a large butcher knife and started stabbing Mrs. Nichols; that Mr. Nichols ran to the bedroom; and that Green and Bobby then left the home.
Detective Noblitt testified that he challenged Green's account and explained to Green that his investigation indicated that only one person had committed the crimes. Noblitt stated that Green again said that Bobby did it. Finally, Green admitted that there was no Bobby, that he was by himself, and that he could not believe what he had done. In his final confession, Noblitt stated that Green admitted that he came home, put on a clean work shirt, and took the largest butcher knife from the house; that he went to the Nicholses' home and was admitted by Mr. Nichols; that Mrs. Nichols was adamant about keeping Green's check; that the next thing he knew was that Mrs. Nichols was on the floor, stabbed and bleeding; that he followed Mr. Nichols to the back bedroom; that the next thing he knew was that Mr. Nichols was on the floor stabbed, bleeding and moaning; that he stuffed the blanket into Mr. Nichols' mouth; that he wiped the blood from his hands onto his shirt, which he stuck into his back pocket; that, as he started to leave, he saw a white neighbor, who also rented from the Nicholses; that he jumped over several fences and returned to his apartment, changed clothes, and walked to the Boston Bar; and that, later that night, he hitched a ride to St. Petersburg and then to Ft. Lauderdale, where he stayed one night before turning himself in to the police department. As part of this statement, Green explained that a scar on the palm of his right hand was the result of a rivet on the butcher knife which cut him when he grabbed the knife and thrust it. He also stated that he had put the knife back in his apartment.
At trial, Green testified on his own behalf and denied having committed the murders or having confessed to the detectives. He claimed instead that Bobby either punched or stabbed Mr. Nichols when he opened the door and that he was intoxicated by cocaine. He maintained that the detectives fabricated his confession.
Id. at 648-50.
At the penalty phase, the only additional evidence presented was testimony from a prosecutor who had prosecuted Green in 1974 for attempted rape, a charge to which Green pleaded nolo contendere and for which he was adjudicated guilty by the court. See id. at 650. The jury at this penalty hearing voted unanimously for the death penalty. See id.
In sentencing Green to death, the trial judge found six aggravating circumstances  (1) that Green had previously been convicted of another capital felony involving the use or threat of violence to a person; (2) that the capital felony was committed while Green was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit, a robbery or burglary; (3) that the capital felony was committed for the purpose of avoiding or preventing a lawful arrest; (4) that the capital felony was committed for pecuniary gain; (5) that the capital felony was especially heinous, atrocious, or cruel; and (6) that the capital felony was a homicide committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. See id. at 650-51. The trial judge found no mitigating circumstances. See id. at 651.
*494 On direct appeal, Green appealed his convictions and death sentences. See id. at 648. Specifically, Green asserted that during the guilt phase of his trial, the trial judge erred by (1) failing to declare a mistrial after the State excluded three blacks as jurors by the exercise of peremptory challenges; (2) allowing certain alleged hearsay statements introduced by the State, depriving Green of a fair trial; and (3) allowing the State to commit fundamental error by insinuating that Green once intended to rely on the intoxication defense. See id. at 651. This Court determined that the trial judge did not abuse his discretion in finding that the exercise of the peremptory challenges was racially neutral and not a pretext. See id. at 652. With regard to the remaining claims in the guilt phase, this Court concluded there was no reversible error. See id.
Green also presented on direct appeal the following errors with regard to the penalty phase of his trial: (1) the trial court's finding that the murders were committed for the purpose of avoiding or preventing a lawful arrest was not supported by the record; (2) the trial court unlawfully doubled the aggravating circumstances that the murders were committed in the commission of a robbery or burglary with their being committed for pecuniary gain; (3) the trial court's finding that the murders were committed in a cold, calculated, and premeditated manner was not justified under the law; (4) the instruction that the murders were especially heinous, atrocious, or cruel was unconstitutionally vague; (5) whether Green had a significant history of prior criminal activity presented a jury question that the trial court improperly failed to submit for consideration; (6) the prosecutor's comments during the penalty phase argument deprived Green of a fair sentencing hearing; and (7) the misleading comments of the trial judge and the prosecutor with regard to the function of the jury denigrated it in light of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). See Green, 583 So.2d at 652.
With regard to the first penalty phase claim, this Court agreed with Green that the use of the aggravating circumstance of avoiding a lawful arrest was not supported by the record. See id. As to the second claim, this Court also agreed with Green that the trial court improperly doubled the aggravating circumstance that the murders were committed in the commission of a robbery or burglary with their being committed for pecuniary gain and concluded these two aggravating factors should be considered as one. See id. With regard to Green's third claim, this Court again agreed that the trial court erred in applying the aggravating circumstance that the murders were committed in a cold, calculated and premeditated manner, concluding that there was insufficient evidence in the record to justify this aggravating circumstance. See id. at 652-53. This Court rejected Green's remaining claims. See id. at 653. Ultimately, this Court concluded that three valid aggravating factors remained and no mitigating factors and thus, affirmed Green's death sentence, determining that there was no reasonable likelihood that the trial court would have concluded differently given the circumstances of this case. See id. On February 24, 1992, certiorari was denied by the United States Supreme Court. See Green v. Florida, 502 U.S. 1102, 112 S.Ct. 1191, 117 L.Ed.2d 432 (1992).
On April 5, 1993, Green filed his initial postconviction relief motion with the trial court. Subsequently, the motion was amended several times. On September 24, 1999, a hearing was held on Green's third amended motion for postconviction relief pursuant to Huff v. State, 622 So.2d 982 (Fla.1993). On January 31, 2000, the trial *495 court entered an order denying most of Green's claims without an evidentiary hearing but granting an evidentiary hearing on several of the claims.
On April 3, 2000, the State and Green entered into a joint stipulation. In the joint stipulation, Green waived his right to an evidentiary hearing on the guilt phase issues on which he was previously granted a hearing by the trial court in its January 31, 2000, order; the State waived the evidentiary hearing on the penalty phase issues on which an evidentiary hearing was previously granted in the January 31, 2000, order; the State agreed that Green was entitled to a new penalty phase trial because of the ineffective representation by Stuart Umbarger, Green's trial counsel at the penalty phase; and Green agreed that he would not appeal the trial court's January 31, 2000, order or the trial court's order with regard to the stipulation. On April 10, 2000, the trial judge accepted the stipulation.
Green's new penalty phase trial was held February 11, 2002, through February 14, 2002. The jury voted ten to two for the death penalty. On April 4, 2002, a Spencer[1] hearing was held, at which the defense presented the testimony of two attorneys who had represented Green, specifically Capital Collateral Regional Counsel (CCRC) attorneys Jeff Hazen and Harry Brody. Hazen testified that he had regular personal contact with Green since Green had been on death row and that Green was very candid, respectful, and genuinely concerned with regard to his family. Brody, who had been in contact with Green since 1998, described him as very easy to deal with and as a person who expressed concern for others.
In sentencing Green to death for each of the two homicides, the trial judge found three aggravating circumstances  (1) that Green had previously been convicted of another capital felony involving the use or threat of violence to a person; (2) that the capital felony was committed while Green was engaged in the commission of burglary or for pecuniary gain (trial court accorded great weight to the pecuniary gain aggravator but did not consider, apply, or weigh the burglary aggravator); and (3) that the capital felony was especially heinous, atrocious, or cruel. In mitigation, the trial judge considered the following factors: the crimes were committed while Green was under the influence of extreme mental or emotional disturbance (moderate weight); Green's capacity to appreciate the criminality of his conduct, or conform his conduct with the requirements of the law was substantially impaired (moderate weight); Green's role was as an accomplice and the offenses were committed by another person and Green's participation was minor (not established); and under the statutory catchall provision,[2] the trial court found that Green demonstrated that he was capable of a warm and loving relationship; had substantial history of stable and successful employment; had experienced a severe personal, social, economic, and health decline as a result of a crack cocaine addiction; was under the influence of cocaine at the time he committed the offenses; had attempted, unsuccessfully, to seek treatment for his addiction; and had voluntarily turned himself in to authorities within approximately ten days. The trial court also considered the Spencer hearing testimony of the two CCRC witnesses (slight weight) as well as Green's letter to the trial court at the Spencer hearing (moderate weight). The trial judge sentenced *496 Green to death for the first-degree murders of Dora and Robert Nichols.
On October 15, 2002, Green filed his notice of appeal to this Court to review the sentences rendered on October 3, 2002.

ANALYSIS
Green presents four claims on appeal.[3] We address each claim in turn. As is more fully addressed below, we affirm Green's sentences of death.

JURY QUESTION
Green contends that the trial court improperly responded to a question posed by the penalty phase jury during deliberations. Abuse of discretion is the standard we apply when reviewing a trial court's instructions given during jury deliberations. See Perriman v. State, 731 So.2d 1243, 1246 (Fla.1999). Discretion is abused "only when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court." White v. State, 817 So.2d 799, 806 (Fla.2002); see also Trease v. State, 768 So.2d 1050, 1053 n. 2 (Fla.2000).
During the penalty phase, the trial court instructed the jury that its recommendation should be either death or life imprisonment without possibility of parole for twenty-five years. During deliberations, the jury posed the following question: "Judge, does a life sentence without the possibility of parole for 25 years start with the year 1987 or does it start with today?" The State suggested that the trial court inform the jury that Green would receive credit for all the time he had served in jail. Green, however, requested that the trial court not answer the question, but simply tell the jury that they should rely on the instructions that had been given to them. Alternatively, Green suggested that if the trial judge decided to respond to the jury's question and inform the jury that Green would receive credit for time served, then the trial judge also needed "to start explaining that . . . it's highly unlikely that a person is going to be released after 25 years just because they become eligible for parole" and that it would possibly be fifty years before Green would be eligible for parole because he could receive two consecutive life sentences.
After reviewing this Court's decision in Downs v. State, 572 So.2d 895 (Fla.1990), the trial judge provided the jury with the following answer: "The defendant, if sentenced to life without possibility for parole for 25 years, would be entitled to credit for all time jail served [sic] against a life sentence. However, there is no guarantee that the defendant would be granted parole at or after 25 years." The State agreed with the trial judge's response while the defense objected to it.
This Court has concluded that a trial judge does not abuse his discretion in refusing to answer a jury's questions regarding a defendant's eligibility for parole if sentenced to life in prison. See Bates v. *497 State, 750 So.2d 6, 11 (Fla.1999) (approving the trial court's decision to refer the jury to the written jury instructions in response to the question "are we limited to the two recommendations of life with minimum 25 years or death penalty . . . [o]r can we recommend life without a possibility of parole"); Whitfield v. State, 706 So.2d 1, 5 (Fla.1997) (approving the trial court's decision to reread the previously given instruction in response to the question "[d]oes life in prison without parole really mean `no parole' under any circumstances [and that] [h]e will never be allowed back into society again"); Waterhouse v. State, 596 So.2d 1008, 1015 (Fla.1992) (approving the trial court's decision to advise the jury to rely on the evidence and the instructions already given in response to the questions "[i]f he's sentenced to life, when would he be eligible for parole," "[d]oes the time served count towards the parole time," and "[i]f paroled from [Florida] would the defendant then be returned to [New York] to finish his sentence there"). Therefore, the trial judge in the instant action would not have abused his discretion if he had simply reread the initial instructions to the jury.
However, the trial judge in the instant action responded to the jury's question. A trial court does have discretion in answering or refusing to answer a jury's question. See Fla. R.Crim. P. 3.410 (providing that if the jury requests additional instructions the trial court may give them additional instructions after notice to the prosecuting attorney and defendant's counsel); see also Garcia v. State, 492 So.2d 360, 366 (Fla. 1986) ("[F]easibility and scope of reinstruction of the jury resides within the discretion of the judge."). The trial judge's response in this case consisted of two parts: (1) "The defendant, if sentenced to life without possibility for parole for 25 years, would be entitled to credit for all time jail served [sic] against a life sentence"; and (2) "However, there is no guarantee that the defendant would be granted parole at or after 25 years." Each part will be addressed in turn.
With regard to the first part of the trial judge's response, this Court has previously approved a similar response provided by a trial court. In Downs, this Court addressed whether a trial court abused its discretion in responding to the following question posed by the jury during deliberations: "Would the life sentence with no chance of parole for 25 years begin right now, or would the 11 years he's already spent in prison be subtracted from the 25 years?" Downs, 572 So.2d at 900. The trial court consulted with both counsel and, over defense counsel's objection, instructed the jury that Downs "would receive credit for time served on this charge." Id. at 900-01. This Court, without analysis, concluded that the trial court did not abuse its discretion. See id. at 901.
The jury's question in Downs and the instant action are virtually identical, both inquiring whether the defendant would receive credit for time served. There is no material difference between the trial court's response in Downs  that the defendant would receive credit for time served on the charge  and the first part of the trial court's response in the instant action  that the defendant would be entitled to credit for all time served. Therefore, similar to this Court's conclusion in Downs, we conclude that the trial judge in this action did not abuse his discretion in responding to the jury that Green would receive credit for time served.
Green, however, asserts that reliance on Downs is misplaced. Specifically, Green contends that Downs and the instant action are distinguishable because his counsel did not make the same argument to the penalty phase jury that Downs' counsel made to Downs' penalty phase jury. *498 Green overlooks that this Court provided no analysis, except for stating the jury's question and the trial judge's response, in reaching its conclusion that the trial court in Downs did not abuse its discretion. See Downs, 572 So.2d at 901. Thus, there is no basis to conclude that the Downs Court considered defense counsel's penalty phase arguments in rendering its decision. Therefore, it is unpersuasive for Green to attempt to distinguish Downs on this factual basis.
Next, we address whether the second part of the trial court's response to Green's penalty phase jury  that "there is no guarantee that the defendant would be granted parole at or after 25 years"  constitutes an abuse of discretion. This Court has not considered this specific issue. In Gore v. State, 706 So.2d 1328 (Fla.1997), this Court approved the trial court's decision to instruct the jury to rely on their recollection of the evidence presented in response to a jury question asking "if and when parole could occur on these other life sentences." Id. at 1333. However, this Court in Gore did not indicate whether answering the jury's question would have been an abuse of discretion, which is essentially the issue presented in the instant action.
In determining whether the trial court abused its discretion in the instant matter, several factors should be considered. First, it is notable that the trial court's answer was not detrimental and was actually favorable to Green. In fact, it was Green's attorney who suggested that the trial judge include in his response that it was highly unlikely that Green would be granted parole at or after twenty-five years. Informing the jury that there was no guarantee that Green would be granted parole at or after twenty-five years actually redounds to Green's favor because it would have served to remind any jurors leaning towards the death penalty based on the perception that Green could be paroled in the near future due to credit for time served that Green could stay in jail for a longer period of time and that there was no guarantee that he would in fact be paroled.
Next, we consider whether the trial court impermissibly commented on a question of fact. A trial court need only answer questions of law, not of fact, presented by jurors during deliberations. See Coleman v. State, 610 So.2d 1283, 1286 (Fla.1992); see also Kelley v. State, 486 So.2d 578, 583 (Fla.1986). Green asserts that the jury's question did not express any confusion over the law they were to apply, but only concern over the consequences of their recommendations, and therefore his penalty phase jury was considering something they should not have been.
In Coleman, the trial judge refused to answer the jury's question regarding whether the vaginal swabs taken from the sexual battery victims matched the defendant's DNA. See 610 So.2d at 1286. The jury's question in Coleman was one of fact. This Court, recognizing that a trial court need only answer questions of law, not of fact, concluded that the trial judge did not abuse his discretion when he advised the jurors that they would have to rely on their collective recollection of the evidence. See id. In addition, in Kelley the jury asked the trial court whether "John J. Sweet received immunity in Florida for first degree murder and perjury before he gave information on the Maxcy trial, and if he had anything to gain by his testimony." Kelley, 486 So.2d at 583. This Court held that the trial court did not abuse its discretion in refusing to answer the question because the jury question involved matters of fact, not questions of law. See id.
*499 Unlike the jury's questions in Coleman and Kelley, in which the trial judge would have interpreted testimony and commented on the evidence presented in formulating an answer, the jury's question in Green's case did not require the trial judge to interpret testimony or comment on evidence. The trial judge's response was limited to clarifying a question of law, one dealing with the amount of credit a defendant was entitled to and clarifying his eligibility for parole. See Perriman, 731 So.2d at 1247 ("Where appropriate, the court may also clarify a point of law with a brief, clear response.").
The reasonableness of the trial court's answer is supported by the fact that it actually favored Green and did not constitute an impermissible comment on a question of fact. We determine that the judge's response in the instant action was not contrary to law nor was it "arbitrary, fanciful, or unreasonable," and thus conclude that the trial court below did not err.

GREEN'S 1987 PENALTY PHASE PROCEEDING
Green urges this Court to review his first penalty phase proceeding, which occurred on October 23, 1987 (hereinafter "1987 penalty phase proceeding"). For the reasons explained below, this claim is denied. As previously noted, on direct appeal, this Court affirmed Green's convictions and death sentences. See Green, 583 So.2d at 648. As a result of a joint stipulation accepted by the trial judge after Green filed his third amended postconviction motion, Green obtained a new penalty phase proceeding, which occurred in February of 2002. Notwithstanding that the instant appeal is Green's direct appeal of his 2002 penalty phase proceeding, here, Green is challenging what occurred at his 1987 penalty phase proceeding. Any claim that Green could have presented with regard to the 1987 penalty phase proceeding is totally moot as a consequence of the circuit court's order granting Green a new penalty phase. See, e.g., State v. Coney, 845 So.2d 120, 139 (Fla.2003) (determining that the defendant's claim that this Court erred in conducting its harmless error analysis after striking an aggravating circumstance was "moot in light of the circuit court's order granting a new penalty phase proceeding"); State v. Riechmann, 777 So.2d 342, 365 (Fla.2000) (determining that the defendant's claim that appellate counsel was ineffective in failing to present a penalty phase issue was "rendered moot as a result of our approval of the trial court's ruling ordering a new sentencing proceeding").
Furthermore, even if this claim were not moot,[4] it would be meritless because the rule established in Grossman v. State, 525 So.2d 833 (Fla.1988), does not operate retrospectively. In Grossman, this Court established a procedural rule that "all written orders imposing a death sentence be prepared prior to the oral pronouncement of sentence for filing concurrent with the pronouncement." Id. at 841. The new procedural rule became effective *500 thirty days after the Court's decision became final. See id.
Green's 1987 penalty phase proceeding occurred before this Court's opinion in Grossman. Specifically, Green was sentenced on October 23, 1987, and the trial judge's written findings were filed on January 13, 1988. Therefore, because Green's first sentencing proceeding was completed prior to this Court's decision in Grossman, the new rule established in Grossman did not apply. See Holton v. State, 573 So.2d 284, 291 (Fla.1990) (concluding that because the sentencing proceeding in Holton's case took place prior to this Court's decision in Grossman the actions of the trial court should be viewed in light of the standards established pre-Grossman); Stewart v. State, 558 So.2d 416, 421 (Fla. 1990) (concluding that the Grossman rule did not apply because Stewart's sentencing proceeding preceded Grossman).
Analyzing this claim under the rule existing pre-Grossman, the trial court, after orally pronouncing a death sentence, was required to enter the written sentencing order in a timely basis. See Van Royal v. State, 497 So.2d 625, 628 (Fla.1986). The trial court complied with the law in operation at the time Green's sentence was rendered. See Grossman, 525 So.2d at 841 (permitting the death sentences to stand even though the trial judge did not enter his written findings until three months after orally sentencing the defendant to death); see also Muehleman v. State, 503 So.2d 310, 317 (Fla.1987) (permitting a death sentence to stand even though the written findings were filed two and one-half months after sentencing). Accordingly, we conclude that this claim is meritless.

SUFFICIENCY OF THE EVIDENCE
Green asserts that there was insufficient evidence to support the pecuniary gain and burglary aggravating circumstances. In addition, Green contends that the trial court's burglary instruction incorrectly stated the law. Each will be addressed in turn. In reviewing aggravating factors, this Court does not reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt  that is the province of the trial court. See Harris v. State, 843 So.2d 856, 866 (Fla.2003); Willacy v. State, 696 So.2d 693, 695 (Fla.1997). Rather, this Court reviews the record to determine whether the trial court applied the correct rule of law for each aggravating circumstance and, if so, whether competent, substantial evidence supports its finding. See Harris, 843 So.2d at 866.
To establish the pecuniary gain aggravating factor, the State must prove beyond a reasonable doubt that "the murder was motivated, at least in part, by a desire to obtain money, property, or other financial gain." Finney v. State, 660 So.2d 674, 680 (Fla.1995) (concluding that the evidence supported the finding that the murder was committed for pecuniary gain where the defendant pawned the victim's VCR shortly after the murder, the victim's jewelry box was missing, and the contents of her purse had been dumped on the floor); Williams v. State, 622 So.2d 456, 463 (Fla.1993) (concluding that the evidence supported the finding that the murder was committed for pecuniary gain where the victims were bound hand and foot, tortured, and interrogated in an effort to extract from them the location of stolen drugs and money).
The record demonstrates that application of the pecuniary gain aggravator in this case is supported by competent, substantial evidence. To support this aggravating factor, the trial court found:
The evidence that was summarized in this case, and was presented at the 1987 trial is that Mr. Green confessed to Detective *501 Noblitt and Sergeant Price that he went to the victim's home at approximately 11:30 in the evening to get back a check he had given them earlier in the day to pay rent. A tenant of the small apartment that the victims rented to that tenant, next door to their home, testified that he heard the attacks on the victims, and then heard someone ransacking, the drawers and the closets. The photographs that were received in evidence depicted the open drawers, blood in the entrance area of the home, and the victim  deceased victims dressed in sleeping attire. It is apparent that the Defendant was looking for that check.
. . . [W]hen Mrs. Nichols told him that they would not return the check, the evidence is that the Defendant attacked and killed them both.
These two homicides were an integral step in the Defendant's efforts to obtain a specific sought after gain, specifically, the check he gave the victims earlier to pay his overdue rent. The murders were committed to facilitate getting that property; therefore, the motivation for the killing was pecuniary.
The evidence therefore established pecuniary gain. . . . This Court accorded the pecuniary gain aggravating circumstance great weight as to each count in determining the appropriate sentences.
The fact that Green went to the victims' house to retrieve the $250 check, which he admitted to Detective James Noblitt, coupled with evidence showing that the Nicholses were stabbed after Mrs. Nichols refused to give Green the check and the evidence indicating that the victims' next-door tenants heard sounds of doors and closets opening and closing at the time of the murder, supports the finding that the murder was committed for pecuniary gain. That Green ultimately did not take the check, which Green likely did not discover because it was in Mr. Nichol's pocket, does not undermine the conclusion that the murders were motivated, at least in part, by pecuniary gain. Therefore, we conclude that there was substantial, competent evidence to support the trial court's finding of the pecuniary gain aggravator.
Green next asserts that there is insufficient evidence to support the trial court's finding that the murders were committed while Green was engaged in the commission of burglary. However, when sentencing Green, the trial court expressly stated that it did not consider, apply, or weigh the burglary aggravating circumstance. Moreover, the plain language of the trial court's sentencing order also stated that the burglary aggravator was not considered. See Singleton v. State, 783 So.2d 970, 979 (Fla.2001) (concluding that the trial court did not consider additional aggravating factors aside from the prior violent felony and heinous, atrocious, or cruel (HAC) aggravators because the plain language of the order stated that no aggravators were considered other than those). Therefore, whether sufficient evidence exists to support the burglary aggravator is irrelevant because it was not considered by the trial court when sentencing Green to death. Accordingly, we conclude this claim is meritless.
Green also challenges the trial court's instruction on burglary. The record reveals that Green failed to object to the burglary instruction. "[T]o preserve an issue for appellate review, the specific legal argument or ground upon which it is based must be presented to the trial court." Occhicone v. State, 570 So.2d 902, 906 (Fla.1990) (quoting Bertolotti v. Dugger, 514 So.2d 1095, 1096 (Fla.1987)). In Occhicone, the defendant asserted that the trial court committed error in not defining the crime of burglary when instructing the *502 jury on the aggravating factor of murder committed during the course of a burglary. See 570 So.2d at 905. During the sentencing proceeding charge conference, Occhicone objected to all of the proposed aggravating circumstances. See id. Regarding the instant one, he argued that "the facts, evidence and circumstances" did not support it. Id. After hearing argument from both sides, the court held that the state could argue this factor and that the jury would be instructed on it. See id. Occhicone did not object again and did not object on the specific ground advanced on appeal, i.e., failure to define burglary, or request the giving of such definition. See id. at 905-06. This Court held that this claim had not been preserved because the defendant failed to present to the trial court the specific legal argument he was presenting on appeal. See id. Similar to Occhicone, we conclude that Green's claim has not been preserved because he failed to object at trial.
Procedural bar notwithstanding, Green's claim is meritless. Green asserts that the trial court erred in submitting the burglary aggravator to the jury based on a definition of burglary that did not take into account this Court's opinion in Delgado v. State, 776 So.2d 233 (Fla.2000). In Delgado, this Court addressed whether the "remaining in" phrase in Florida's burglary statute should be limited to situations where the suspect enters lawfully and subsequently remains surreptitiously. See id. at 238. This Court concluded that the "remaining in" phrase of the burglary statute was limited to the defendant who surreptitiously remains on the premises. See id. at 240.
Green's convictions became final before Delgado was decided. The Delgado Court's interpretation of the burglary statute does not apply retroactively to convictions that were final prior to the release of that opinion. See Jimenez v. State, 810 So.2d 511, 512 (2001). Thus, the interpretation of the burglary statute articulated in Delgado is not applicable to Green's 2002 resentencing because his convictions were final prior to the release of this Court's opinion in Delgado, and Green's sentence is controlled by the law in effect at the time he committed the offense. See Larkins v. State, 739 So.2d 90, 96 n. 5 (Fla. 1999) (stating that a defendant's sentence is controlled by the law in effect at the time he committed the offense). Therefore, the trial judge was not required to use the definition of burglary articulated in Delgado.
Finally, we address whether the trial court's burglary instruction to the jury correctly stated the law in effect at the time Green committed the murders. The 1985 burglary statute provided in pertinent part:
(1) "Burglary" means entering or remaining in a structure or a conveyance with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter or remain.
§ 810.02, Fla. Stat. (1985). In its instructions, the trial judge informed the jury as follows: "Burglary is defined as entering or remaining in a structure owned by another without the permission or consent of the owner with intent to commit an offense therein." The trial court in this case submitted the burglary aggravator to the jury based on the words used in the burglary statute. Accordingly, we conclude that this claim is meritless.

CONSTITUTIONALITY OF FLORIDA'S DEATH PENALTY STATUTE
Green asserts that Florida's capital sentencing scheme violates the United States Constitution under the holdings of *503 Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). This Court has previously addressed this argument and denied relief. See Jones v. State, 845 So.2d 55, 74 (Fla.2003). Thus, we conclude that Green is likewise not entitled to relief on this claim. Additionally, one of the aggravating circumstances the trial judge considered in this action was Green's prior conviction of assault with intent to commit rape (a felony involving the use or threat of violence to the person), as well as his convictions of the contemporaneous murders of Dora and Robert Nichols. See Stein v. State, 632 So.2d 1361, 1366 (Fla. 1994) ("[A] contemporaneous conviction of a violent felony may support the aggravating factor of prior conviction for a violent felony so long as the two crimes involved multiple victims or separate episodes."). These prior violent felony convictions alone satisfy constitutional mandates because the convictions were rendered by a jury and determined beyond a reasonable doubt. See Doorbal v. State, 837 So.2d 940, 963 (Fla.), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003). Accordingly, Green is not entitled to relief on this claim.

PROPORTIONALITY
Finally, although Green does not challenge the proportionality of his death sentence, this Court must still ensure that the sentence is proportional. See Rimmer v. State, 825 So.2d 304, 331 (Fla.) ("Although appellant does not argue the proportionality of the death sentence in this case, this Court must nevertheless conduct a proportionality review."), cert. denied, 537 U.S. 1034, 123 S.Ct. 567, 154 L.Ed.2d 453 (2002). This review "is not a comparison between the number of aggravating and mitigating circumstances; rather, it is a thoughtful, deliberate proportionality review to consider the totality of the circumstances in a case, and to compare it with other capital cases." Beasley v. State, 774 So.2d 649, 673 (Fla.2000) (internal quotation marks omitted).
The jury in this action recommended the death penalty by a vote of ten to two. The trial court considered the following aggravating factors: (1) Green was previously convicted of another capital felony or a felony involving the use or threat of violence to the person (great weight), see § 921.141(5)(b), Fla. Stat. (2002); (2) Green committed the murder for pecuniary gain (great weight), see § 921.141(5)(f), Fla. Stat. (2002); and (3) Green committed the murder in this case in an especially heinous, atrocious, or cruel fashion (great weight), see § 921.141(5)(h), Fla. Stat. (2002).
In mitigation, the trial judge considered the following factors: the crimes were committed while Green was under the influence of extreme mental or emotional disturbance (moderate weight); Green's capacity to appreciate the criminality of his conduct, or conform his conduct to the requirements of the law was substantially impaired (moderate weight); Green's role was as an accomplice and the offenses were committed by another person and Green's participation was minor (not established); and under the statutory catchall provision,[5] the trial court found that Green had demonstrated that he was capable of a warm and loving relationship; had substantial history of stable and successful employment; had experienced a severe personal, social, economic, and health decline as a result of a crack cocaine addiction; was under the influence of cocaine at the time he committed the offenses; had *504 attempted, unsuccessfully, to seek treatment for his addiction; and had voluntarily turned himself in to authorities within approximately ten days. The trial court also considered the Spencer hearing testimony of the two CCRC witnesses (slight weight) as well as Green's letter to the trial court at the Spencer hearing (moderate weight).
The circumstances of this case are similar to other cases in which this Court has affirmed the sentence of death. See Duest v. State, 855 So.2d 33, 47 (Fla.2003) (holding the death sentence proportional for the first-degree murder conviction where the aggravators included HAC, prior violent felony conviction, and robbery/pecuniary gain and the court found twelve nonstatutory mitigating circumstances), cert. denied, 541 U.S. 993, 124 S.Ct. 2023, 158 L.Ed.2d 500 (2004); Butler v. State, 842 So.2d 817, 833 (Fla.2003) (holding the death sentence proportional for the first-degree murder conviction where only the HAC aggravator was found); Singleton v. State, 783 So.2d 970, 979 (Fla.2001) (holding the death sentence proportional for the first-degree murder conviction where the aggravators included prior violent felony conviction and HAC). Comparing the circumstances in this action to the cases cited above and other capital cases, we conclude that the sentence of death is proportionate.

CONCLUSION
Based upon the foregoing, we conclude that there is no reason to reverse the trial court's judgment sentencing Green to death for two counts of first-degree murder. We therefore affirm the sentences imposed by the circuit court below.
It is so ordered.
WELLS, LEWIS, CANTERO, and BELL, JJ., concur.
PARIENTE, C.J., and ANSTEAD, J., concurs in part and dissents in part with opinions.
QUINCE, J., recused.
PARIENTE, C.J., concurring in part and dissenting in part.
Although I agree with the majority's analysis of most of the issues raised, I concur with Justice Anstead that the defendant is entitled to a new penalty phase based on the trial court's answer regarding when the defendant would be eligible for parole.
ANSTEAD, J., concurring in part and dissenting in part.
While I agree with the majority's analysis in most respects, I must respectfully dissent as to the resolution of two issues: (1) the implications of the U.S. Supreme Court's decision in Ring v. Arizona on Florida law; and (2) the trial court's response to the jury's question.

RING
I will not belabor my differences with the majority on Ring, since a majority of this Court has rejected every attempt by a death-sentenced defendant to claim the benefit of Ring's holding that a jury, not a judge (as in Florida), must make the findings as to which, if any, aggravating circumstances exist to justify the imposition of a death sentence. I respectfully disagree with my colleagues' determination that Ring's mandate should not be followed in Florida.

ADVICE TO JURY
The other critical issue on which I differ with the majority concerns the completeness of the trial court's response to the jury's question as to how a life sentence and its prohibition on the consideration of parole for twenty-five years might play itself out in this case.
*505 It is apparent on the face of the jury's question that the jurors were seriously considering a recommendation of life, but wanted to know in advance how such recommendations would work in this case, since the defendant had been incarcerated since 1987 for these two murders. The questions are logical for jurors considering a recommendation, with the obvious implication being that the defendant's eligibility for parole in less than twenty-five years would work against him.
Because one can only speculate about a defendant's chances for parole, especially when he has been convicted of not one, but two murders, it might have been the wiser choice for the trial court not to speculate at all, but to leave the jurors where they were with the instructions previously given. But here, the trial judge did respond, and, even assuming his response was technically accurate, the response was clearly flawed for what it did not tell the jurors. First, we should be clear that the response given certainly did not favor the defendant since it told the jury that with a life sentence the defendant would soon be eligible for parole, not in twenty-five years, but in ten, a very short time, indeed, if the jury is concerned, as jurors logically would be, with keeping a killer off the streets for a long time.
However, what the judge did not tell the jurors was that the defendant could receive two consecutive life sentences, and that credit for time served would be applied only to the first of the two sentences, which would mean that under the second life sentence he would not be eligible for parole for at least thirty-five years from his sentencing date in October of 2002. Further, his second consecutive life sentence would not start to run until his first life sentence expired. Clearly, this is a circumstance that might have influenced the jury to recommend consecutive life sentences, since the jury was obviously considering such sentences. But the jury was never given this information.
Now, as I indicated at the outset, it might have been better not to speculate on this issue at all. But once the decision was made to respond to the jury's concern, the defendant was entitled to have a complete response that included the possibility of consecutive life sentences. We must remember also that the defendant was placed in this position by errors delaying his sentencing that were not of his doing. Rather, in this case, the State stipulated that defendant's trial counsel's performance at his initial sentencing was constitutionally inadequate. Hence, the defendant was placed in a veritable Catch-22: he was constitutionally entitled to a new sentencing, but the delay in providing a proper sentencing was then used against him.
In my view, there can be no doubt that the trial court's incomplete response prejudiced the defendant and ultimately played a critical role in the jury's decision not to recommend consecutive life sentences. This was not a fair procedure and the defendant should be entitled to a resentencing untainted by the one-sided and incomplete response to the jury's critical question.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993).
[2] See § 921.141(6)(h), Fla. Stat. (2002).
[3] Green's claims include: (1) the trial court erred in answering the jury's question with regard to whether a life sentence without the possibility of parole for twenty-five years would start from 1987 or from the date of the sentencing recommendation; (2) Green's 1987 death sentences should be vacated in favor of life sentences because the trial court originally sentenced Green to death orally on October 23, 1987, and then filed a written order with his findings in support of the death sentence on January 13, 1988; (3) there was insufficient evidence to support the trial court finding the pecuniary gain and burglary aggravators and submitting them to the jury, and the trial court incorrectly instructed the jury with regard to the burglary aggravator; and (4) Florida's death penalty statute is unconstitutional.
[4] In his direct appeal of his 1987 convictions and sentences, Green asserted that seven errors occurred during the penalty phase. However, Green did not assert his instant claim  that his death sentences should be vacated in favor of life sentences because the trial court failed to file a timely written order of his findings in support of the death sentences. This claim is procedurally barred because it could have and should have been presented on direct appeal of the 1987 death sentences, but was not. See Harvey v. Dugger, 656 So.2d 1253, 1256 (Fla.1995). Therefore, this claim with regard to the 1987 death sentences is improperly before this Court which is now reviewing Green's 2002 penalty phase proceeding.
[5] See § 921.141(6)(h), Fla. Stat. (2002).