# Supreme Court of Florida

_____

No. SC12-702

_____

**GREGORY DAVID LARKIN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[May 22, 2014]

PER CURIAM.

Gregory David Larkin was convicted of the April 2009 first-degree murders of his parents, Richard and Myra Larkin, and he was sentenced to death for both murders. This is Larkin's direct appeal. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Having reviewed the record and considered the issues presented, we affirm Larkin's convictions and sentences.

## I. BACKGROUND

In July 2009, a Nassau County grand jury indicted Larkin, who was 35 years old, on two counts of first-degree murder in the deaths of his parents in April of

that same year. The case proceeded to a jury trial, at which Larkin elected to represent himself.

## A. Self-Representation

Although the trial court initially appointed a public defender, Brian Morrissey, to represent Larkin, Larkin subsequently sought to discharge counsel at a November 2009 hearing. Larkin contended that Morrissey waived his right to a speedy trial, played a role in covering up a "second indictment" signed by another judge, and tried to elicit information from Larkin in secretly recorded conversations to aid the prosecution. Under oath, Morrissey explained Larkin's apparent confusion regarding the different judges at different proceedings, stated that he was unaware of any illegal recording of confidential interviews with his client, and referenced the judge's earlier explanation that a speedy trial was waived in light of the substantial issues in the case. Defense counsel assured the trial court that he was working on behalf of his client to address the charges. The trial court concluded that there was no basis for Larkin's claim that defense counsel was rendering ineffective assistance. Accordingly, the trial judge asked if Larkin wanted to discharge counsel and represent himself, and Larkin declined.

In July 2010, Larkin obtained private counsel in lieu of Morrissey. However, in September 2011, private counsel requested and was granted permission to withdraw from representation. At that time, Larkin sought to

represent himself.  The trial court held a Faretta hearing, see Faretta v. California, 422 U.S. 806 (1975), informing Larkin of the advantages of having a lawyer, questioning Larkin about his understanding of the limitations and disadvantages of self-representation, and determining his competency to knowingly and intelligently waive counsel.  Larkin stated that he was 38 years old, knew and understood English, had attended two years of community college, was not impaired, had never previously represented himself, and while awaiting trial, had read some of the books in the law library.  The judge determined that Larkin was competent to waive counsel but withheld his ruling.  Then, at a hearing on October 13, 2011, Larkin reaffirmed his desire to represent himself, and the trial judge ruled that Larkin could represent himself but reappointed Morrissey as standby counsel.  At subsequent hearings on November 3 and December 20, 2011, the trial court again discussed the advantages and disadvantages of self-representation, and Larkin reaffirmed his election to represent himself and to have only standby counsel.

On January 5, 2012, before the hearing on Larkin's motion to suppress, the trial judge again held a Faretta colloquy and encouraged Larkin to obtain or accept counsel in light of the seriousness of the proceeding.  Larkin, however, chose continued self-representation, stating that he understood the pros and cons of his decision.  Larkin then argued the motion to suppress authored by prior counsel, contending that the police did not have probable cause to arrest him in April 2009

and that the evidence obtained from his hotel room at that time should be suppressed. After hearing arguments, the trial court denied the motion.

During jury selection the next day, Larkin again declined the offer of appointment of counsel and stated that he would allow the prosecutor to select the jury. After the judge and prosecutor questioned the potential jurors, Larkin declined to strike any potential juror. For reasons that included opposition to the death penalty, a stated inability to be impartial, and work-related hardship, among others, the trial court struck ten potential jurors, and the prosecutor struck four. In addition, two alternate jurors were chosen.

## B. The Guilt Phase

The trial commenced on January 9, 2012. Larkin invoked the rule to exclude witnesses from the courtroom, and the jury was sworn in. See § 90.616, Fla. Stat. (2011). After the prosecutor's opening statement, Larkin argued to the jury that he was innocent. He stated that the evidence would show that his parents were killed three to five days before their bodies were discovered on April 18, 2009, and that he was out of the country from April 12 to April 18. Claiming that no evidence tied him to the murders, he stated that there were no fingerprints or DNA evidence on the murder weapon and two witnesses would testify that they saw or spoke to Larkin's parents on April 14, 2009, when Larkin was out of the

country. Finally, he argued that the prosecution could not produce an eyewitness or establish a motive for the murders.

The evidence at trial showed that in January 2009, Larkin unexpectedly arrived at his parents' Fernandina Beach home for a visit and stayed for several months. Larkin managed the family owned business in Costa Rica, a dive shop named Aquamor. The business was failing at that time, and there was ongoing dissension in the family over whether to sell it. Richard Larkin, III (Rick), Gregory Larkin's older brother, testified that their father was actively trying to sell the business at the time of his death and Gregory Larkin opposed the sale. Other members of the family also disagreed on whether they should sell the business.

The evidence showed that late on the morning of April 12, 2009, Larkin parked his parents' car at the Jacksonville International Airport, bought a one-way ticket to Mexico at about 11:30 a.m., and flew to Mexico in the mid-afternoon. One week later, on the morning of April 18, a Nassau County Sheriff's deputy was dispatched to the Larkins' home to perform a wellness check that was prompted by a family friend's concern about not having heard from Richard and Myra Larkin for several days. The deputy found a FedEx package on the Larkins' doorstep that had been delivered on April 14. No one responded when the deputy knocked on the door and rang the doorbell. He then walked around to the back of the house, where he entered the unlocked screen enclosure around the pool. Peering through

the glass doors into the family room, he saw Myra Larkin lying dead on the floor with a pool of dried blood by her head.

When backup officers arrived, they forced entry into the securely locked home. In the living room where Myra Larkin's body lay, blood and blood spatter was observed on various surfaces, including a chair and hassock, the entertainment center and television, the wall, and covers of magazines. As the officers searched the house, they soon found Richard Larkin dead, lying on the floor of his garage office. His face was unrecognizable, and a large stone statue from the pool area lay on his chest. There was blood on the office cabinets, walls, desk chair, office machinery, and paperwork, and a baseball bat discolored by blood was found just outside the office door.

Except for the two murder sites, the house was otherwise tidy, although there was some clutter on the kitchen counter—food items, wine, and used wine glasses—apparently related to meal preparation. Valuables including televisions, jewelry, computers, and Myra Larkin's purse, however, were in plain view. In light of this fact and evidence that the home was securely locked, it was clear that no burglary had occurred. Documents on the dining room table were admitted into evidence over Larkin's hearsay objection. They included plane tickets with Larkin's name on them, copies of e-mails to Richard Larkin offering to discuss the purchase of Aquamor, and Gregory Larkin's scuba certification card.

Because Richard and Myra Larkin's vehicle was missing, a BOLO was quickly issued, and the vehicle was located in the parking lot of the Jacksonville International Airport later on the same day that the murders were discovered. Also, Gregory Larkin flew into Jacksonville that evening, arriving at approximately 10 p.m. and then checking into a nearby hotel. That is where authorities found him in the early morning hours of April 19. After an initial interview, he was taken to the Police Memorial Building in Jacksonville for further questioning, which was videotaped. Over Larkin's objection, the trial court admitted the initial portion of the videotape into evidence but granted his objection to exclude the portion of the video that followed Larkin's invocation of his right to counsel.

During the interview, Larkin was not told that his parents were found dead, and he did not ask about his parents. Larkin told law enforcement officers that he left his parents' home on April 12 and flew to Mexico to look for a job. He explained that he took his parents' car because they were supposed to leave on a trip for which they had planned to rent a car. Asked if he had called his parents upon his return to Jacksonville, Larkin told police that no one answered the phone when he called, but it was possible that he had misdialed, as he sometimes did. The police arrested Larkin for grand theft of the automobile and, pursuant to a warrant, searched his hotel room. In his backpack, they found, among other items,

airline ticket receipts and his mother's gold bracelet, which his brother Rick Larkin later testified was valued at $8,000. The grand theft auto charge was ultimately nolle prosequied.

With regard to time of death, evidence of when people last saw the victims was presented. Moyra Bird-Owens, a longtime friend of Myra Larkin, testified that she last spoke to Mrs. Larkin on April 10, 2009. She then went to the Larkins' home on April 12 but left when she saw that the garage door was closed and the car was gone. Her subsequent telephone calls went unanswered. Rick Larkin, the Larkins' oldest son, testified that he last spoke to his mother on April 11, and that his parents' bank account showed no activity since that date. April 11 was also the last time Rick spoke to his brother Gregory before the murders. They made plans for Gregory to visit Rick the following weekend on April 17, but Gregory did not contact Rick further. In addition, the manager of a movie rental business testified that Myra Larkin was a regular customer who always returned rentals promptly, but she did not return the movie that she rented on April 11. Home Depot and Harris Teeter sales receipts and security videos of April 11 showed that Myra Larkin made purchases at the stores at 3:35 and 4:23 p.m. Not only did the items on the grocery store's conveyor belt match the groceries found on the Larkins' kitchen counter on April 18, but when Myra Larkin's body was discovered, she was dressed in the same clothes that she wore in the April 11 store videos. The

evidence indicated that when she was killed, she was sitting in the living room watching the movie that she had rented on April 11. When Richard Larkin was killed, he was using the computer in his home office, which was built into the garage. He typically spent much of his time there. The computer was last used on April 11, 2009, at 8 p.m.

The medical examiner, Dr. Jesse Giles, conducted both autopsies. At the outset of his testimony, the trial judge overruled Larkin's objection that photographs of the decedents at the crime scene were unduly prejudicial. Dr. Giles testified that both victims were killed at about the same time and estimated that when found on April 18, the couple had been dead for at least three to five days, but it could have been as many as seven days. He explained that such estimates are inexact and might be affected by external factors, such as when the victims were last contacted or seen alive, or when a computer was last used or a movie was rented. He concluded that both Richard and Myra Larkin died from skull fractures and hemorrhaging resulting from blunt force trauma. The manner of death was homicide.

According to Dr. Giles, Myra Larkin was attacked from behind. A significant blunt force blow to the left side of her head caused massive skull fractures and tearing of her scalp, resulting in part of her brain emerging from her skull. In addition, she had defensive injuries to her arm and hand resulting from a

blunt force blow that lacerated her hand, exposing the tendons and fracturing a finger. Dr. Giles opined that the weapon had no discernible pattern and was likely smooth, which was consistent with a baseball bat.

Richard Larkin was also likely to have been attacked from behind. He sustained at least five or six blunt force blows to his head, resulting in a broken skull cap and extensive brain injuries. The lacerations and bruising on his arm were defensive wounds. In addition, post-mortem, the victim's face was mashed flat, his nose broken, and his ribs fractured on both sides of his chest. Dr. Giles stated that Richard Larkin's wounds indicated an assailant with a significant degree of anger.

Arnika Edmondson, an analyst with the Florida Department of Law Enforcement (FDLE), developed complete DNA profiles of Larkin and the two victims in order to analyze various evidentiary items. She then tested a T-shirt, a pair of shorts, and two pairs of socks found behind the bathroom door nearest to the bedroom where Gregory Larkin's belongings were located. The blood on the exterior of the T-shirt matched the DNA of Richard Larkin. The blood on the front of the shorts matched Myra Larkin's DNA. Edmondson testified that when people exercise heavily, DNA can be transferred to their clothes. The DNA from the interior waistband and zipper area of the shorts—"wearer DNA"—matched Gregory Larkin's profile. The likelihood that the wearer DNA would match an

unrelated person other than Gregory Larkin was one in 6.9 quadrillion Caucasians, one in 2.1 quintillion African Americans, and one in 18 quadrillion Southeastern Hispanics. A partial profile of wearer DNA on one sock of a pair also matched Gregory Larkin. On the other pair of socks, Richard Larkin's blood was found on the bottom of both socks and his wife's on the top of one sock.

DNA testing of two used wine glasses in the kitchen sink resulted in matches with Myra Larkin's DNA on one and Gregory Larkin's on the other. The frequency of recurrence of Gregory Larkin's DNA profile was one in 370 trillion Caucasians, one in 49 quadrillion African Americans, and one in 520 trillion Southeastern Hispanics. A swab from one area of the baseball bat showed Myra Larkin to be the major contributor to a mixture of DNA, and a swab from another area of the bat contained Richard Larkin's DNA.

An FDLE fingerprint expert, William Tucker, testified that no usable or identifiable fingerprints were found on various objects, including the baseball bat, but Larkin's fingerprints were found on an energy drink can. In addition, Matthew Ruddell, an FDLE digital evidence analyst, examined the computers in the home and testified that the last time the computer in Richard Larkin's office was used was April 11, 2009, at 8 p.m.

Testimony on forensic crime scene reconstruction was provided by Michael Knox, a forensic consultant. He opined that the motive for the murders was not

robbery, but the trial judge sustained Larkin's objection that this statement was speculative. Knox then testified that in light of the similarity of injuries suffered by the victims, the evidence showed that one assailant used a single weapon in the attack. Moreover, blood splatter analysis indicated that both victims were attacked from behind. Regarding Myra Larkin's murder, Knox testified that an initial glancing blow to Mrs. Larkin's head also struck an adjacent lamp. Although she moved to escape, she was soon so disabled by the subsequent blows that she collapsed onto the floor, where she was struck again.

According to Knox, the murder of Richard Larkin was dramatically different and lasted for a longer period of time. He was sitting in a chair at his desk in his garage office with his back to the doorway when his assailant hit him on the head. Richard Larkin was struck by multiple blows, and his blood splattered all over the room. Like his wife, he tried to ward off the attack to no avail and stood up. Ultimately, he fell to the floor and crawled on his hands and knees on the bloody floor, where he died lying on his back. Post-mortem, a large statue was brought from the pool area and dropped upright on his face. The statue was found lying partly on Richard Larkin's body. White powder found on the T-shirt and shorts found in the bathroom was consistent with the surface of the white garden statue and with the residue from the pool area where the statue had stood. The trial court sustained Larkin's objections that any testimony by Knox on the meaning of

dropping the statue on Richard Larkin's body and the reason this attack was more prolonged was speculative.

Finally, Knox explained that Myra Larkin was killed first, noting that Richard Larkin's murder was bloodier, but none of his blood was present in the living room where Myra Larkin was killed. In addition, the noise from the violent murder of her husband in his office would have alerted her, but she was assaulted while she remained seated on a living room chair watching a movie. The trial court sustained the State's objection to Larkin's question of whether the listing of his father's murder in the first count of the indictment raised reasonable doubt regarding the deaths.

Two other family members testified. Ron Larkin, Gregory Larkin's uncle, testified that he visited Larkin on numerous occasions after his arrest. Gregory Larkin told him that on April 11, Gregory worked outside the house building some flower boxes and went on a lengthy walk in the neighborhood. Gregory then returned to the house and had dinner with his parents. Afterwards, Gregory drove to Jacksonville, stayed in a hotel overnight, and flew to Mexico the next day. Ron Larkin testified that he tried but failed to locate the hotel at which Gregory stayed, and Gregory could not recall the hotel's name. Katrina Larkin, Gregory Larkin's sister, testified that when she lived with her parents for a few months in 2005, she observed their routine. Typically, her father was using the computer in his garage

office, watching television, or cooking. Her mother usually drank wine in the evening, and Gregory also drank wine several times a week. With regard to Gregory's visit to her parents' home in 2009, she testified that his visit occurred during the rainy season in Costa Rica, when there was little to no business for the family dive shop.

Larkin called four defense witnesses in his case and conducted the direct examinations. Michael O'Hagen, an acquaintance of Richard Larkin, testified that a few days after Easter (April 12, 2009), possibly on April 14, he saw Richard Larkin at a convenience store. They discussed coaching children's soccer. On cross-examination, the witness stated that he did not recall the exact date and that Richard Larkin probably was driving his white SUV that day, as he usually did.

Moyra Bird-Owens returned to the stand and testified that as a longtime friend, she spent a lot of time with the Larkins over many years. She stated that Gregory Larkin had a very good relationship with his parents. During his latest visit, she had travelled with the three of them to Jekyll Island. Gregory had been very helpful, and she did not observe any drug use by him. In addition, she was aware that the Larkins planned to take a trip to Savannah, Georgia, on April 14, 2009, and had reserved a rental car to travel in a more reliable vehicle than their own. Asked if Richard Larkin had any enemies, she responded that she knew Allstate Insurance Company was his enemy, and she did not know if that situation

was ever resolved.  Finally, she testified that Gregory sent her a letter from jail in which he maintained his innocence.

Two neighbors of the Larkins also testified for the defense.  Judith Ankerson testified that her home faced the victims' home.  She often saw Richard Larkin through his office window when she took her morning walks.  She was uncertain of the date, but she believed that she last saw Richard and Myra Larkin on April 14, 2009, and that she noticed Richard's office window blinds were closed sometime around April 15, which was unusual.  Nancy Lane also had known the family for a long time.  The family's relationships were healthy and loving, and they had fun together.  She testified that she did not recall hearing any arguments between Gregory Larkin and his parents while he was at home.  She recalled that on one visit to her neighbors' home, Gregory was working on the computer looking for employment with dive shops, including businesses in Mexico.  Finally, she testified that Allstate Insurance Company was Richard Larkin's enemy.

In rebuttal testimony, Sergeant Michelle Christensen of the Nassau County Sheriff's Office testified that the Larkins' vehicle was in a parking lot of the Jacksonville International Airport on April 12 and was also there on April 14.  Security video from the convenience store for that date showed neither O'Hagen nor Richard Larkin.  Further, after learning of the murders, Judith Ankerson, who was out of town at the time, contacted authorities about when she last saw the

victims. Sergeant Christensen testified that during the phone conversation with Ankerson, she claimed to have last seen Myra Larkin planting flowers at the mailbox on April 14, but Ankerson was uncertain of the date. Sergeant Christensen testified, however, that there were no flowers planted around the mailbox.

At the close of the evidence, Larkin affirmed to the trial court that he would not testify and had no more witnesses to call. The trial judge then denied Larkin's motion for judgment of acquittal. In his closing argument, Larkin argued that the small amount of blood found on the clothing from the bathroom—the T-shirt, shorts, and socks—was inconsistent with the bloody crime scene and there was no proof regarding when those clothes were worn. Moreover, there were no fingerprints on the murder weapon. In fact, there was no witness, no motive, and no clean-up of the scene. Thus, there was no hard evidence sufficient to support a conviction. Larkin further claimed that he chose to represent himself because his right to a speedy trial was violated when the public defender waived it and because he had been wrongly accused of the grand theft of his parents' car.

After deliberation, the jury returned verdicts of guilty on both counts of first-degree murder. The judge renewed the offer of counsel to Larkin, who responded that he would think about it. The trial judge indicated that he would soon hold another Faretta hearing.

### C. Mental Competence

At the January 12, 2012, hearing, the trial court renewed the offer of counsel to Larkin but he declined. After the <u>Faretta</u> hearing, the trial court again found Larkin competent to waive counsel and that the waiver was knowingly and intelligently made. Morrissey then addressed the trial court, stating that he had just concluded that Larkin suffered from a delusional disorder. He requested that the trial court order a mental health evaluation, noting that the motion was based on Larkin's behavior during the trial but providing no specifics. The trial judge ordered a mental health evaluation based solely on Morrissey's conclusory motion.

Dr. William Meadows, a forensic psychologist, evaluated Larkin by administering two tests—the "Structured Inventory of Malingered Symptomology (SIMS)" and the "Minnesota Multiphasic Personality Inventory, Second Edition (MMPI-2)"—and conducting interviews with Larkin and several of his family members. The testing indicated that Larkin was not malingering, and although Larkin was impulsive and narcissistic, he did not suffer from psychotic disturbances. The expert concluded, however, that Larkin's understanding of the adversarial nature of legal proceedings, his capacity to disclose pertinent facts to counsel, and his capacity to testify relevantly and coherently were unacceptable. Further, Dr. Meadows found that Larkin gave an illogical account of the evidence, believed the two witnesses who testified in his defense that they had seen his

parents alive when Larkin was in Mexico, described a bizarre conspiracy involving an insurance company, and believed that his prior counsel were involved in a conspiracy to withhold exculpatory evidence. Accordingly, Dr. Meadows concluded that Larkin met the "provisional DSM-IV-TR [Diagnostic and Statistical Manual of Mental Disorders] diagnostic criteria for a Delusional Disorder" and was thus incompetent to proceed.

Subsequently, a hearing was held on January 19, 2012, regarding the report. Larkin again elected to represent himself, and the trial judge found him competent to waive counsel. The prosecutor argued that Dr. Meadows' report did not call Larkin's competence into question and that a second evaluation was not necessary. The trial judge noted that the evidence cited in the report to support the conclusion that Larkin was delusional would require Larkin to disbelieve evidence that he had presented at trial and that Larkin's self-representation at trial contradicted any conclusion that he did not understand the legal proceedings. In addition, the trial judge questioned Larkin regarding some of the statements ascribed to him in the report. Then, turning to Morrissey, the judge asked him to provide evidence of Larkin's incompetence. When Morrissey responded that his motion for a mental health evaluation was based on the same behaviors that the judge had observed at the trial and again cited no specific examples, the judge stated that unlike Morrissey, he had not observed any delusional behavior by Larkin during the trial.

After stating that he would reject the competency determination if this were not a death case, the trial judge called Dr. Meadows to testify at a hearing. Consistent with his report, he opined that Larkin was not competent to proceed. Dr. Meadows acknowledged that he was unaware of the degree to which Larkin represented himself at trial, such as making opening and closing arguments and entering valid objections. Further, Dr. Meadows stated that some of the collateral information, such as the report that Larkin believed in the existence of demons and angels on earth, came from Larkins' family members, and Dr. Meadows did not discuss these reports with Larkin. Dr. Meadows also opined that Larkin was delusional with regard to his father being threatened by an insurance company. However, when questioned by Larkin at the hearing, Dr. Meadows acknowledged that Larkin had told Dr. Meadows about a letter Larkin had received from his father, Richard Larkin. The letter indicated that if anything happened to his father, Larkin should look for a video that his father had made regarding his difficulties with the insurance company. It was this video that Larkin believed was being withheld from him by prior defense counsel. Morrissey declined the opportunity to question Dr. Meadows.

The trial court subsequently appointed a second expert, Dr. Alan Waldman, a psychiatrist, to examine Larkin, and a brief hearing was held to accept that report. Dr. Waldman's mental health evaluation concluded that Larkin was competent to

proceed. He found that Larkin fully appreciated the charges and the range of penalties, understood the adversarial nature of the legal process, and had the capacity to disclose pertinent facts to counsel, as he had to the doctor in the examination. Larkin also understood what was needed to exculpate him. Further, Larkin could realistically challenge prosecution witnesses, manifest appropriate courtroom behavior, and testify relevantly. Dr. Waldman opined that Larkin was not overtly psychotic or delusional and diagnosed him with a "Personality Disorder Not Otherwise Specified." Although Larkin believed that there was a conspiracy against him for a quick conviction, Dr. Waldman stated that such conspiracy beliefs are not uncommon and in this case did not evidence mental illness.

Because the first two mental health evaluations conflicted, a third expert, Dr. Umesh Mahtre, a psychiatrist, evaluated Larkin. Dr. Mahtre found that the testing previously conducted showed no evidence of psychosis and concluded that Larkin was competent to proceed. In addition, he noted that Larkin had no history of paranoia or psychiatric problems and that Larkin was not schizophrenic and did not suffer from any paranoid personality disorder. A hearing was held on February 2, 2012, to accept the third report. Again the trial judge began with a <u>Faretta</u> inquiry, Larkin chose self-representation, and the trial judge found him competent.

**D. Penalty Phase**

As in the prior proceedings, Larkin waived counsel in the penalty phase. The State declined to present any witnesses, the trial court declined a request by two family members that the trial court call them as court witnesses, and Larkin declined to present mitigation witnesses and to testify. After the prosecutor made an opening argument and Larkin declined the opportunity to make a statement, the trial court called Dr. Meadows as the court's witness. Larkin did not conduct the examination of Dr. Meadows; instead, the trial judge appointed standby counsel Morrissey, pursuant to Muhammad v. State, 782 So. 2d 343, 364 (Fla. 2001), to question the witness.

Dr. Meadows testified—consistent with his evaluation—that Larkin was intelligent and was not fabricating mental illness, but he was defensive during the mental health evaluation. Dr. Meadows stated that the testing and interview demonstrated that Larkin was unwilling to admit to basic human flaws or psychological weaknesses. Such defensiveness, Dr. Meadows opined, may indicate that Larkin has psychiatric issues but does not want to be seen as psychiatrically impaired. Moreover, Larkin made statements of a persecutory delusional nature. Larkin's family members reported that Larkin seemed increasingly paranoid over time, stating that Larkin made bizarre statements about demons and angels. In addition, Larkin told Dr. Meadows that he believed his attorneys conspired against him. On the other hand, Larkin had no history of

- 21 -

alcohol or drug abuse and no history of paranoia or other psychotic disturbances. Larkin was coherent, intelligent, and ran a business, but he was also immature, self-centered, and impulsive. Considering the testing and the other information, Dr. Meadows concluded that there was sufficient test data to support a provisional diagnosis of a delusional disorder but Larkin was not overtly psychotic.

After deliberation, the jury unanimously voted for the death penalty as to both murders. The jury was discharged, and the trial court once again renewed the offer of counsel, which was declined.

### E.  Spencer Hearing

At the beginning of the Spencer hearing, the trial judge's offer to appoint counsel was again declined. See Spencer v. State, 615 So. 2d 688, 690-91 (Fla. 1993). A packet of letters from family and friends in support of Larkin was presented to the trial court, and three witnesses testified. Helena Larkin, Gregory Larkin's sister-in-law, showed photos of Richard and Myra Larkin and described how they were admired and loved by family and friends. She also related the nightmare experienced by the family in the aftermath of the murders. Heather McLaughlin, the victims' niece, testified that she sought therapy after the murders. She described the murders as an act of evil and said the question of Larkin's guilt had broken the family apart. Finally, Rick Larkin described how the murders had broken the family irreparably apart. Referring to the letters from family members

and others offered to the trial court in mitigation, he called them a gift to Larkin.

No other statements were presented, and Larkin presented no mitigation evidence.

## F.  Sentencing

On March 15, 2012, the trial court sentenced Gregory Larkin to death on both counts of first-degree murder.  In the murder of Richard Larkin, the trial court found two aggravating factors and accorded them each great weight: (1) Larkin had a prior capital or violent felony conviction; and (2) the murder was especially heinous, atrocious, or cruel (HAC).  The first factor was based on the contemporaneous murder of Myra Larkin.  In finding the HAC aggravator, the court noted that the victim was repeatedly beaten in the head with a baseball bat and died from the resulting skull fractures and hemorrhaging.  Moreover, the evidence showed that Richard Larkin stood up and turned to face his attacker and was injured in his efforts to defend himself from the blows.  Accordingly, death was not instantaneous, and Richard Larkin was conscious and aware both of the attack and the identity of his attacker.

The trial court explained that in light of Larkin's decision not to present mitigation evidence during the penalty phase, the record was reviewed for evidence to support any of the statutory mitigators.  See § 921.141, Fla. Stat. (2009).  Accordingly, the trial judge found that two statutory mitigating factors were established and ascribed each the weight indicated: (1) Larkin had no

significant history of prior criminal activity (some weight); and (2) Larkin was a good son, a hard worker, and rescued some people from drowning (little weight). The trial court determined that another statutory mitigator— substantially impaired capacity to appreciate the criminality of the conduct or conform to the requirements of law—was not established.

In sentencing Larkin to death for the first-degree murder of Myra Larkin, the trial court again found the HAC aggravator and accorded it great weight, citing the multiple blows from the baseball bat that resulted in broken bones, brain lacerations, and a broken skull. Moreover, Myra Larkin's defensive wounds evidenced her consciousness during the brutal beating. The trial court also found the prior violent felony aggravator, based on the contemporaneous murder of her husband, Richard Larkin, but gave that factor little weight because she was the first victim. Finally, with regard to mitigation, the trial judge made the same findings and ascribed the same weights to each factor as he did regarding the murder of her husband.

The trial judge concluded that as to each first-degree murder, the aggravating factors far outweighed the mitigating factors that were found to exist. Accordingly, he sentenced Larkin to death on both counts of first-degree murder.

## II.  ANALYSIS

On appeal from his dual convictions and sentences of death, Larkin raises the following claims: (A) the trial court committed reversible error by permitting Larkin to represent himself during competency proceedings; and (B) Florida's capital sentencing statute is unconstitutional under <u>Ring v. Arizona</u>, 536 U.S. 584 (2002). In addition to addressing these claims, we also: (C) review the record to determine whether competent, substantial evidence supports the verdict; and (D) determine whether the death sentences are proportionate.

## A. Competency and Self-Representation

Larkin argues that his Sixth Amendment right to counsel was violated when the trial court failed to appoint counsel to represent him during a hearing regarding his competence to proceed. We disagree and conclude that neither Dr. Meadows' report nor Morrissey raised a reasonable doubt about Larkin's mental competence. A trial court's decision regarding a determination of competency is subject to review for abuse of discretion, and the trial court's resolution of factual disputes will be upheld if supported by competent, substantial evidence. <u>McCray v. State</u>, 71 So. 3d 848, 862 (Fla. 2011), <u>cert. denied</u>, 132 S. Ct. 1743 (2012). Accordingly, for the reasons explained below, we hold that the trial court did not abuse its discretion by determining that Larkin was competent to continue to exercise his right to waive counsel and represent himself during the competency proceedings.

As we have previously stated, "[i]t is well-settled that a criminal prosecution may not move forward at any material stage of a criminal proceeding against a defendant who is incompetent to proceed." Caraballo v. State, 39 So. 3d 1234, 1252 (Fla. 2010). In Drope v. Missouri, 420 U.S. 162, 171 (1975), the Supreme Court stated that "a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." See Fla. R. Crim. P. 3.210(a) ("A person accused of an offense or a violation of probation or community control who is mentally incompetent to proceed at any material stage of a criminal proceeding shall not be proceeded against while incompetent."). Accordingly, the test for determining a defendant's mental competence is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960); see § 916.115, Fla. Stat. (2009) (providing for appointment of experts "to determine the mental condition of a defendant in a criminal case"). This standard is echoed in Florida Rule of Criminal Procedure 3.211(a)(1). In making the competency determination, the examining expert must consider the defendant's capacity to appreciate the charges and range of potential penalties, understand the adversarial nature of the

- 26 -

proceedings, disclose pertinent facts to counsel, behave appropriately in court, and "testify relevantly." Fla. R. Crim. P. 3.211(a)(2)(A)(vi).

In this case, Morrissey raised the issue of Larkin's competence at the conclusion of the guilt phase, throughout which Larkin represented himself. The right to self-representation may be exercised only by a defendant who is competent and makes a knowing and voluntary waiver of counsel. See Fla. R. Crim. P. 3.111(d); Faretta, 422 U.S. at 835-36. Moreover, where the trial court finds a defendant has made a knowing waiver of counsel, the court cannot deny an unequivocal request for self-representation absent a determination that the defendant "suffer[s] from severe mental illness to the point where the defendant is not competent to conduct trial proceedings by himself or herself." Fla. R. Crim. P. 3.111(d)(3). In Indiana v. Edwards, 554 U.S. 164, 177-78 (2008), the Supreme Court explained that

> [t]he Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under Dusky but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.

In this case, at the time Morrissey moved for a mental competency determination, Larkin had continuously met the standard of competence required for self-representation, including on the day of the competency hearing. For

example, Larkin argued motions on valid legal grounds, raised valid objections that were upheld, conducted both direct and cross-examination of witnesses, and made opening and closing arguments to the jury. Larkin was well-mannered throughout the proceedings and was not combative with the trial court or the witnesses.

Florida Rule of Criminal Procedure 3.210(b) provides that if at "any material stage" of a criminal case, the trial court, defense counsel, or the State "has reasonable ground to believe that the defendant is not mentally competent to proceed, the court shall immediately" set a competency hearing and may order up to three expert examinations of the defendant. Moreover, a written motion for a mental competency evaluation "shall contain a certificate of counsel that the motion is made in good faith and on reasonable grounds to believe that the defendant is incompetent to proceed" and "<u>a recital of the specific [non-privileged] observations of and conversations with the defendant that have formed the basis for the motion</u>." Fla. R. Crim. P. 3.210(b)(1) (emphasis added). In this case, when Morrissey raised the question of Larkin's competence, he offered not a single specific example to support the claim. The motion was based on unspecified observations and allegedly—but unidentified—illogical decisions that Larkin made during the court proceedings. Thus, the trial court ordered the examination solely because Morrissey requested it and not because a "reasonable ground" to doubt Larkin's competence had been demonstrated.

Larkin contends that error occurred when he was allowed to continue to represent himself at the hearing held on the incompetency determination by Dr. Meadows. At the hearing, before Dr. Meadows arrived, the trial judge again asked Morrissey for a factual basis supporting his original allegation of incompetence. Morrissey could provide none, instead suggesting that the trial judge witnessed the unspecified behavior as well. The trial judge responded that he had not witnessed any delusional behavior by Larkin at the trial. In fact, the judge stated that the competency report's findings were completely contradicted by the events at trial. For example, Dr. Meadows' findings that Larkin lacked an understanding of the adversarial nature of the trial and the capacity to testify coherently were clearly rebutted by his able self-representation at trial. Moreover, Dr. Meadows' determination of incompetency was based in part on Larkin's belief that an insurance company had targeted his father and that Larkin insisted people had seen his parents alive while he was in Mexico. However these facts were supported by witness testimony at trial. In addition, Larkin created no disruptions at trial, and the trial judge witnessed nothing to indicate that Larkin was delusional. Accordingly, the trial court found the report "flimsy at best" and stated that had it not been a death penalty case, he would have rejected the determination. Dr. Meadows' testimony at the hearing did nothing to alter the trial court's conclusion.

Moreover, the other mental health experts who subsequently examined Larkin found him competent to proceed.

In this case, the initial incompetency determination did not raise a reasonable doubt regarding Larkin's competency. The findings were clearly contradicted by the actual events at trial. Accordingly, we conclude that the trial court did not abuse its discretion by allowing Larkin to continue to represent himself during the competency proceedings.

## B. The Ring Issue

Larkin argues that Florida's death penalty statute is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002). We have consistently rejected Ring claims in cases such as this one, where the jury recommended a sentence of death by a unanimous vote. See Bevel v. State, 983 So. 2d 505, 526 (Fla. 2008). Moreover, we also have previously rejected Ring claims in cases in which one of the aggravating factors found is a prior violent felony conviction. See Frances v. State, 970 So. 2d 806, 822 (Fla. 2007). In this double murder case, the prior violent felony aggravator for the contemporaneous murder supports each death sentence. Id. ("Ring did not alter the express exemption in Apprendi v. New Jersey, 530 U.S. 466 (2000), that prior convictions are exempt from the Sixth Amendment requirements announced in the cases. This Court has repeatedly

relied on the presence of the prior violent felony aggravating circumstance in denying <u>Ring</u> claims.").  Accordingly, Larkin's claim has no merit.

### C.  Competent, Substantial Evidence

Regardless of whether Larkin raises the issue, this Court independently reviews the record in death penalty cases to determine whether competent, substantial evidence supports the conviction.  <u>Pham v. State</u>, 70 So. 3d 485, 501 (Fla. 2011), <u>cert. denied</u>, 132 S. Ct. 1752 (2012).  "In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt."  <u>Bradley v. State</u>, 787 So. 2d 732, 738 (Fla. 2001).

In this case, the evidence showed that Gregory Larkin, the manager of the family's dive shop, lived with his parents during a period of family turmoil regarding the financial difficulties and fate of this Costa Rican-based business.  In the spring of 2009, Richard Larkin was actively seeking a buyer for the failing business, a decision that Gregory Larkin—who would lose his job—vigorously opposed.  On April 11, 2009, Myra Larkin went shopping and returned home in the late afternoon.  Richard and Myra Larkin apparently ate dinner, and then Mrs. Larkin sat down to watch a movie that she had rented that day, while Richard Larkin used the computer in his office in the garage.  She was still wearing the

same clothes in which she appeared in store security videos earlier that day. In addition, some of the groceries that she had purchased that afternoon were on the kitchen counter, including open wine bottles. Used wine glasses, with Gregory Larkin's DNA on one and Myra Larkin's on the other, were nearby. Around 8 p.m., the last time the home office computer was used, the murderer entered the living room, approached Myra Larkin from behind as she sat watching a movie, and then beat her with a baseball bat until she lay on the floor and died in a pool of blood from the resulting injuries. The assailant then walked up behind Richard Larkin, who sat using his computer in the garage office, and attacked him in the same manner, landing multiple blows with a baseball bat, as Richard Larkin attempted to rise and defend himself. As Richard Larkin lay dead on the floor, the assailant carried a large statue in from the pool area and dropped it on the victim's face. On the next morning, April 12, Larkin parked his parents' car in the parking lot of the Jacksonville International Airport, bought a one-way ticket, and flew to Mexico. The bodies of Richard and Myra Larkin were found a week later, on April 18. There were no signs of burglary, and the house was securely locked. DNA from blood on clothing—shorts, a T-shirt, and socks—found in the bathroom nearest to Gregory Larkin's bedroom matched the DNA profiles of Richard and Myra Larkin, and DNA from the waistband of the shorts indicated that Gregory Larkin wore them. In addition, a white powdery substance, consistent with the

pool statue, was found on the T-shirt. The record shows that Larkin did not contact or go to visit his brother on April 17, as initially planned. Instead, having never contacted anyone about his trip, he returned from Mexico to Jacksonville on April 18. Then, instead of going to his parents' home, Larkin checked into an airport hotel, where authorities found him. He told the officers that his car keys had been stolen during a robbery in Mexico. In light of the foregoing, we find that sufficient evidence was presented for the jury to find Larkin guilty of two counts of first-degree murder in the deaths of Richard and Myra Larkin.

## D. Proportionality

The death penalty is reserved for the most aggravated and least mitigated first-degree murders. Lebron v. State, 982 So. 2d 649, 668 (Fla. 2008). In conducting a proportionality review, this Court considers the totality of the circumstances in the case and compares it with other capital cases to determine whether the capital case falls within this category and the death sentence is thus warranted. Moreover, we accept the trial court's weighing of the mitigating and aggravating factors. Smith v. State, 7 So. 3d 473, 510 (Fla. 2009). Proportionality review "is not a comparison between the number of aggravating and mitigating circumstances." Sexton v. State, 775 So. 2d 923, 935 (Fla. 2000) (quoting Porter v. State, 564 So. 2d 1060, 1064 (Fla. 1990)). Thus, it is a qualitative rather than a

quantitative review. Here, the strength of the aggravating factors and little mitigation found in the record support the sentences of death.

In this case, the trial court sentenced Larkin to death for the murder of his parents. The judge found the same two aggravators applicable to both murders—a prior violent felony conviction for the murder of the other parent and HAC. With regard to the first aggravating factor, the trial judge ascribed great weight in the death of Larkin's father but little weight to the same factor in the murder of his mother, the first victim. The HAC aggravator was given great weight as to both murders. Regardless of the weight ascribed by the trial court, however, HAC and prior violent felony conviction are deemed two of the most serious aggravating circumstances. See Jackson v. State, 18 So. 3d 1016, 1035 (Fla. 2009) (noting that HAC falls in most serious aggravator category); Chamberlain v. State, 881 So. 2d 1087, 1108-09 (Fla. 2004) (finding that prior violent felony conviction is one of the most serious aggravators). Moreover, the trial court found little mitigation, ascribing some weight to the statutory mitigator of no significant criminal history and little weight to the catchall provision of other mitigating factors in the Larkin's background, noting that Larkin was a good son and a hard worker, and had rescued two people from drowning. Accordingly, the aggravation more than outweighed the mitigation here. In addition, the jury unanimously recommended the death penalty for both murders.

This Court has affirmed the imposition of the death penalty in comparable cases. In <u>Green v. State</u>, 583 So. 2d 647, 648-49 (Fla. 1991), the defendant killed a couple from whom he rented his apartment when they refused to return his late rent check, with which he wanted to buy cocaine. Armed with a butcher knife, Green repeatedly stabbed the female victim and went to the back bedroom, where he stabbed her husband twenty-eight times. <u>Id.</u> at 649. After a new penalty phase, the jury recommend death sentences by a ten-to-two vote, and the trial court imposed such sentences, finding the following three aggravating factors as to each murder and according each great weight: the defendant had a prior capital felony conviction; the capital felony was committed for pecuniary gain; and the murder was especially HAC. <u>Green v. State</u>, 907 So. 2d 489, 495 (Fla. 2005). As to each murder, the trial judge found two statutory mitigators of moderate weight: defendant was under the influence of extreme mental or emotional disturbance; and defendant had an impaired capacity to appreciate the criminality of his conduct. The trial judge also found a number of factors under the catchall mitigation provision, § 921.141(6), Fla. Stat. (2009), including that Green was "capable of a warm and loving relationship; had [a] substantial history of stable and successful employment; had experienced a severe personal, social, economic, and health decline as a result of a crack cocaine addiction; . . . and had voluntarily turned himself in to authorities." <u>Green</u>, 907 So. 2d at 495. In addition, the trial judge

- 35 -

gave slight weight to the testimony of two witnesses and moderate weight to Green's letter offered during a <u>Spencer</u> hearing.  <u>Id.</u>

Similarly, in <u>Rigterink v. State</u>, 66 So. 3d 866, 870-71 (Fla. 2011), the trial court sentenced the defendant to death for the stabbing deaths of two people in a warehouse.  The trial court found the same two aggravators that were applied in the instant case—HAC and prior violent felony conviction.  In addition, the court in <u>Rigterink</u> found that the avoid arrest aggravator was applicable to one of the murders.  <u>Id.</u> at 871 (quoting <u>Rigterink v. State</u>, 2 So. 3d 221, 234 (Fla. 2009)). The trial court found that each aggravator carried great weight.  As in the instant case, the court found the statutory mitigator of no significant prior criminal history and assigned it some weight.  <u>Id.</u> at 871.  The trial court also found twelve factors of nonstatutory mitigation.  <u>Id.</u>

Finally, in <u>Bright v. State</u>, 90 So. 3d 249, 253-54 (Fla.), <u>cert. denied</u>, 133 S. Ct. 300 (2012), the defendant killed two men in his home, beating them to death with a hammer.  The jury recommended death sentences by an eight-to-four vote as to both murders.  <u>Id.</u> at 256.  The trial court also found and weighed the same aggravators and mitigators in both murders.  The court found three aggravators of great weight: the defendant had a prior violent felony conviction based on a robbery; the defendant had a prior violent felony conviction that was based on the contemporaneous murder; and the murder was HAC.  <u>Id.</u> at 256-57.  Further, the

judge found one statutory mitigator—the murders were committed while defendant was under the influence of an extreme mental or emotional disturbance—and nineteen nonstatutory mitigators—including that defendant had a history of drug abuse, had a decade of military service with an honorable discharge, and was a good brother and father—to which the trial court ascribed weights varying from slight to considerable. Id. at 257. This Court found that the evidence presented at trial was "consistent with a scenario in which Bright waited until the victims were asleep, and then attacked them." Id. at 258.

After reviewing the facts and relevant cases, we hold that the death sentences imposed in this case are proportionate.

### III. CONCLUSION

Having reviewed the issues presented by Larkin, as well as the sufficiency of the evidence to support the convictions and the proportionality of the sentences of death, we affirm the judgment and sentences of death in this case.

It is so ordered.

POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED

An Appeal from the Circuit Court in and for Nassau County,
    Robert Mallory Foster, Judge - Case No. 45-2009-CF-000448-AX

Nancy A. Daniels, Public Defender, and Nada M. Carey, Assistant Public Defender, Tallahassee, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, and Renee M. Rancour, Assistant Attorney General, Tallahassee, Florida,

for Appellee